is now in session. Okay, thank you. Welcome to this proceeding. Just a few reminders. Please do not photo or video this proceeding. Obviously, the audio will be available later on on the court website. Please recall that when you're citing to the record, it's helpful to have an actual record citation and not merely a reference to the record, particularly a record this long. And of course, rebuttal is for rebuttal only. And please recall that when you're not speaking, you should be when it's not your turn, you should be muted. All right. With that, we will call case number 19 dash 30261 Smith versus Vannoy. And we will begin with Miss Connor. Good afternoon, Your Honors. Rachel Connor on behalf of Jerome ski Smith. We're here on an appeal of the district court's finding that Mr. Smith lacked the jurisdiction to file his successive habeas petition. There are two threshold issues before we get to what I want to focus the majority of my time on, which is the clear and convincing evidence of Jerome Smith's actual actual innocence of first degree murder. The first issue is the issue of equitable tolling. As the court is aware, Mr. Smith's pro se petition was filed two days after its epic deadline, and the district court held at that time was excused by equitable tolling. If the court has questions about the equitable tolling issue, I can I can address that more fully. But I think that, you know, the district court's ruling is judged by is reviewed for an abuse of discretion. And I think under the circumstances of this case, where where Mr. Smith is incarcerated, where he was filing pro se, where he was on lockdown at the time that the petition was due and where there was some confusion as to whether or not the Fifth Circuit would be transferring the petition to the Eastern District. Under those circumstances, I found that it was. The problem that I have is that the date that gave rise to the two day analysis was a kind of assuming arguendo date, like the very latest possible date that the year could begin to run was May 2012, something like that. I don't remember the exact date, May whatever. I don't remember the exact date, May 18, I think. Anyway, that date was an assuming arguendo date. It was not an analysis of actually when did they know this and that and then this passed and then the state was doing this. So we can put that time aside and on and on and on because the magistrate judge came out the other way. So is it even giving you every last, you know, benefit you still lose? The district court then took the two days. So we don't have to do the assuming arguendo. So can you please explain why that is the right date and why we should only be looking at the two days? Well, I think that date comes, that date comes from the date that the Louisiana Supreme Court issued, issued its denial. This court, the Fifth Circuit only granted Mr. Smith permission to file his successive petition in March of that year and the state had the opportunity to object to the date that the magistrate was using and the date that the district court was using and the state at no point objected to either of those times. So I think that the court was right to have used that date and that's the date, that's the date that Mr. Smith was relying on. But the problem is if he did know at least some of this information, let's say long ago, there's gaps in time in the state court proceedings. It's not one, you know, he files a state court proceeding the day after he finds out about this missing, you know, tape, files a state court proceeding and then for the next, I don't know, 12 years the state court proceeding is pending back and forth and up and down. There's gaps of time and if you add up those gaps of time, they're longer than a year before we ever get to this issue of whether he was on lockdown and all of that. Well, I think that the standard before this court is whether it would be unduly harsh to not grant him equitable tolling under the circumstances and since the Fifth Circuit had granted him under the circumstances where the Brady allegations are very serious, where the Orleans Parish DA's office did not disclose that material until nearly 15 years after Mr. Smith's conviction, that it would be under the circumstances of this case unduly harsh under those circumstances to hold that time against Mr. Smith. We've got to know what time we're analyzing to even make that analysis is what I'm saying. It's one thing if we're talking about two days during which he's on lockdown, which is a separate issue because I understand he caused his own lockdown, but we'll get to that later. Even if we accepted, assuming arguendo, those two days could be forgiven, I don't know that we can forgive all of the other time frames and those were just simply not looked at by the district judge. The magistrate judge, again, I'd assume arguendo because it came out the other way. And I think where the case law comes down is, is a petitioner sitting on their rights or are they diligently pursuing their rights in federal court? And I think under the circumstances of this case, you have to, you have to look at whether or not the district court abused its discretion when it determined that Mr. Smith was not sitting on his rights, that at every moment going forward from the district court, from, excuse me, from the trial court and state court, through the district court, through his request to this court for permission to file the successor petition, that he was diligent at every turn. He was placed on lockdown and he, he made phone calls to his mother. He had sent the petition to the fifth circuit and was under the impression that the fifth circuit would mail the petition to the Eastern district, which the fifth circuit ultimately did when his mother paid for the postage, but it required all of that follow-up. And this is a pro se petitioner who's been incarcerated at the Louisiana State Penitentiary. So I think you have to look at whether or not this is someone who was sitting on his rights or whether this was someone who was diligently at every turn pursuing his rights, which this is a petitioner who pro se petitioned to this court for the very stringent standard of actual innocence and was granted the opportunity at least of making out a prima facie case to present his full, to present his full arguments to the district court. Miss, the various pieces of evidence that he's saying were not disclosed or that were withheld, um, what was, was all of that known to him as early as 2001 or was it known to him, made known to him later than that? I believe that all of the information was finally disclosed to him in post-conviction proceedings in state court in 2001. So that's, I realize that was a long time after his conviction was in 1985. But I just, it's, I share Judge Haynes' puzzlement over the equitable time because I'm not sure when we're measuring it from. Um, I get the arguments about the lockdown. I'm just not sure when we're measuring his diligence from, but we'll, we'll have to look at the record. And, and the, and the district court looked at when ultimately, when, and I, I think it bears repeating that this is someone who's filing all of these petitions pro se without counsel that by the time he meanders through state court, I think we're dealing with the Louisiana Supreme Court, um, their final denial. And as I said before, you know, the state had multiple opportunities to object to that date. And, or when the district court ultimately used it. Um, so the date that we're operating under is when the Louisiana Supreme Court, um, denied relief. Okay. Are there more issues on the equitable tolling or shall I move on? Um, so I'm going to move on to the jurisdiction question, assuming, um, assuming that it was properly timely filed due diligence. Um, we're here on a successive petition because the DA's office, um, affirmatively represented through 15 years of proceedings in state court, that there was no Brady evidence that none of these witnesses had in fact given statements, um, and that there was no NOPD supplemental report. And that's why we're here on a, on a successive, as opposed to an original petition where Mr. Smith could have raised all of those Brady claims. Um, all of those pieces of Brady evidence were significant information. They were significant in that this was a case where, um, Jerome, who was 15 years old at the time, um, who had a very, um, determinate alibi for the time of the crime at a youth studies center, which is, which is of no small moment. He wasn't, you know, at, at a store. He wasn't at playing video. He wasn't at an arcade. He was meeting with a probation officer and, um, and no one at, at any point noticed anything kind of untoward about his appearance. Can I ask you just sort of a larger conceptual question? Is it, we have three eyewitnesses. We have the two Thompsons and then we have Mr. Weil. Is that right? That's correct. So, so let, I don't know, you have arguments as to each one of them, but let's, let's say, let's assume that you knock out Desiree Thompson because, you know, for whatever reason, uh, we decide, yeah, that her statement really was contradictory and it should have been, it should, it was prejudicial not to, not to, um, disclose it. But the problem is, is that you still would have two other eyewitnesses putting him at the scene, both of whom picked him out of a lineup. So how do you overcome that? There's this problem. You have to knock out all three, I guess is what I'm asking. A lot has been made about the strength of the eyewitness identifications and that these are all independent witnesses. The fact of the matter is that there was a lead detective who had arrested Jerome Smith in the past, who Jerome Smith was known to, and who was determined to be the suspect on the night of this shooting. So detective Saladino had in his mind that, um, Jerome Smith was, was the shooter. He went to have a lineup made, 14 pictures were made that contained two pictures of Jerome Smith. Um, and that the, the lineup procedure itself was done in an incredibly suggestive way. And I think that all of the, um, all of the Brady confirms that it was, that it was done in a suggestive way. I think the, the, the through line is, is, is the lead detective and whether consciously or unconsciously, you know, eyewitness identification is the lead cause of, of, um, erroneous convictions, wrongful convictions, um, in this country. And that can be done where the person who is administering the lineup believes that they know the suspect. So where there's an assumption made that the suspect is actually contained in the lineup. Um, now double blinds lineup procedures are recommended where the person who's administering the lineup doesn't know who the suspect is. Um, having the photographs shown in that way, where someone is making relative judgments about what the, what the, um, who the suspect is, as opposed to actually picking and what the council, the defense in the case, as I understand it was, as I think you mentioned earlier, it was the alibi that he had an alibi and the alibi is based entirely on the timeline from the gas station to the meeting he went to. And then he was sitting in the reception area until the time he went into the child, whatever the appointment was. So, and as I further understand it, the defendant was able to put on all of his timeline evidence. Is that right? He was able to put on the timeline evidence from, from the Smith's residence to the gas station, to the youth study center, correct? So what's your, your, your complaint about with regard to the Brady material has to do with the prosecution's pinpoint of the time, whether it's when Mr. Weill looks at his watch wondering, I think that was 4 0 7 or 4 0 9. Why is it taking so long? Uh, and then we had the two police officers, uh, who also, I think radio at some point 4 14 or so. Uh, so that's, and that evidence was actually brought out at trial as well. Is that correct? So the evidence about Mr. Weill is correct. The evidence about the two police officers, they actually testified that they were at the scene much closer to four. So the incident would have had to have happened at four in order for all of these, you know, minute by minute events to have taken place for Mr. Smith to have been at his appointment on time. And so what, what the suppressed documents did was actually place the time much closer to 4 15. Um, and the contemporaneous statements of Weill, of, of the Thompson sisters were suppressed. So at trial, everyone testified that it was, you know, around four, whereas the value of the suppressed documents was that it actually put the time of the shooting much more like 4 15. So the, so the two first page of the police report did have that 4 10 to 4 15 number already, which you all did, or not you personally, but, uh, Smith's attorneys did have from the start. There was one page of that original document that said 4 10. The issue with the supplemental police reports was that they were authored and that it was clear from the supplemental police reports that the information that they were getting those times from were Mr. What was Mr. Weill. And so, um, without the supplemental police reports, the trial attorneys were not able to cross examine Mr. Weill about the time of the incident and were not able to call actually the first reporting officers with their reports to hold on just a second. Pam, if you can give her two more minutes and also Mr. Ambrosio will get two more minutes. Go ahead. You had you had another point. You want to make the actual actual innocence. I want to make sure you have a chance to make that. I do want to get to the actual actual innocence. I think all of this is, you know, I think all of this is really important. The value of that impeachment material is really important because, um, the district court, I think, improperly found that all of this information was known to defense counsel without taking into consideration that even if you believe a time may have been earlier, the value of having a document and having a police officer to verify that document and to have a police officer impeach a lay witness can't be understated, even if a trial counsel wants to I think kind of a common sense argument that's backed up by all of this Brady. And the common sense argument is that it just completely strains common sense to believe that a 15 year old, um, who is that a 15 year old decides to shoot the owner of this bakery, run through a run through a schoolyard, push a kid off his bike, get home, has presumably bloody clothes from having shot this person at close range, has a gun, has a bike, um, is able to dispose of all of that evidence and be completely timely with his mother for an happening and that the police had settled on Jerome Smith that night and no physical evidence was ever recovered in this case, that all that was ever presented were these very shaky eyewitness identifications, um, that, that, and all of this Brady evidence would have undermined the veracity of those, um, of those eyewitness identification. So I, that, that's my argument is that it, in Globo, it strains credibility and all of this Brady evidence would have gone to show that these witness, um, identifications were not nearly as strong as what the detective went back and cleaned them up and bolstered and was allowed to testify that they were. All right. Thank you. You've reserved some time for rebuttal. Thank you. All right. Mr. Ambrosia. May it please the court. Michael Vincent Ambrosia on behalf of the appellee, Daryl Vinoy, warden of the Louisiana state penitentiary. In this case, the petitioner argues that the district court erred in denying his second habeas petition. However, for the following reasons, in addition to the reasons explained in our brief, the district court's judgment should be affirmed. Here, I will discuss the two main reasons as well as their subparts further detail. First, the district court's dismissal of petitioner's successive habeas petition should be affirmed because it was untimely. In the instant case, the district court erred in finding that the petitioner's second habeas petition was timely based on equitable tolling. Second, the district court's dismissal of the petitioner's second habeas petition should be affirmed because the petitioner failed to meet the stringent requirements of the Anti-terrorism and Effective Death Penalty Act for bringing successive habeas petitions. On equitable tolling, I guess one thing I'm confused about is I'm going back to Judge Haynes's question, which is the district judge seemed to sort of assume arguendo that we start the tolling clock from when the Louisiana Supreme Court denied writs or whatever it was it did. And the magistrate didn't sort of find that. The magistrate just assumed that. In your view, or does the state have a view that here's where the clock starts running? Because my concern is that it's assuming quite a lot to say that equitable tolling is only accounting for two days, maybe accounting for much more, but it depends on when you start counting. When do you start counting? Does the statute help us? Do cases help us? You help me? Well, yes, your honor. I believe that to my knowledge, the magistrate's finding was that the petitioner wasn't entitled to statutory tolling. So in that sense, the clock would have started to run from the date of the denial of his last round of post conviction applications. So, I mean, even if assuming that it started to run at that date, uh, the date that it became final, two days after, if you were to grant him equitable tolling, he still would have been delinquent, but not for that equitable tolling. Um, the main, I think the main point comes down to, you know, whether or not he should have been granted equitable tolling. Um, I mean, I know that this, do you not, had you not gone back to say 2001 and walk through everything that happened since then because even on a regular habeas, we look through and sometimes there's gaps in times you've gone to the state court for this and then you left and then you went back and back and forth and back and forth. So there's these months that we start to add up and sometimes it's a complex calendar. Have you done that? And if so, what is your argument on how long, what, instead of an assuming arguendo, what is the right date? Um, I mean, to my knowledge, this is, um, I, I believe that this defender, this petitioner went through, I think, four rounds of, um, post-convict conviction relief application. And that based on the most recent round, I'm not sure of the exact date of when that started and concluded, but, um, yeah, you're right in the sense that it is very complicated as to when we start and then stop the clock and actually, you know, apply statutory tolling to the deadlines. But, you know, it's the state's position that the main issue here is that the defendant should not have been granted equitable tolling based on the legal standards set forth and the precedent set forth even by this court. Um, I know that the fifth circuit has, uh, you know, stated and held that only in rare circumstances, rare and exceptional circumstances is equitable tolling permitted. And the petitioner has to meet two requirements in order to receive equitable tolling. First, they have to be which is, so don't you have to have a starting date? I think that's what we were trying to get at is somebody's got to count from point A to point B and then, and then wave the flag and say, well, now it's over. Uh, that's the exercise. Absolutely. Well, I believe if, if even following the calculations that, um, you know, were laid, laid forth in the district court and, and by the, the magistrate, um, assuming that those are correct, um, and the deadline stopped two days before, um, he actually submitted his filing. Uh, then the petitioner would require that equitable tolling. So he would have been delayed. That's the assuming arguendo date. I guess, well, what we're looking for is, is your argument that it doesn't matter whether he's in comfortable using the assume, assuming arguendo date and refuting the lockdown, the two to two extra days in lockdown. I think that that would be the, the, the, the better approach. I think that the state would concede the, um, the arguendo day and, um, contend that the petitioner did not demonstrate that he was diligently pursuing his rights and that, um, he was, he, he benefited from some sort of extraordinary circumstance that stood in his way and prevented him from filing. Um, because this is jurisdictional. So, um, I guess my question would be, is your concession the end of the story, or are we still obligated because of jurisdictional issues to go back? And because to me, my understanding, there are gaps of time between 2001 and 2012, where he is not in state court. So those would not be a part of this, you say the statutory tolling. So if this is just, if this is a jurisdictional question, then we can't take your concession. If it's not, we can. So please tell me in this context, what your argument is on that. Um, with regards to, I guess, the concession of, um, the jurisdictional issue, um, ultimately it is for the court to decide, you know, when and where the clock, um, did and did not stop in between this, uh, petitioner seeking relief in the state court level. And when he was not seeking relief in the clock would have run, um, just based on what I have before me and my understanding is that, um, the main issue and the main error that was made at the district court was the granting of equitable tolling based on the defendant's representation. Okay. Why don't you address that? What's wrong with giving him a little bit of, you know, he has this back and forth with the mom and thinking it's going to be sent to us and so on and so forth. Why didn't that get him two days? Um, well, I think it's, it's twofold for two main reasons. Uh, first, um, it is our position that the petitioner was not noted. Uh, the petitioner received the state's case file and all of the new evidence contained there and no later than 2001. However, the petitioner did not present all of his claims based on the new evidence to state courts until 2008. Um, furthermore, the petitioner was not diligently pursuing his rights because he allowed the better part of a year to pass before taking the first steps towards filing successive habeas petition. Um, additionally, uh, the district court erred in finding that petitioners lockdown constituted extraordinary circumstances worthy of equitable tolling. Uh, the Supreme Court held in Menominee Indian tribe that extraordinary circumstances prong is meant to cover matters outside of a party's control. So, um, here the petitioner, uh, submits that he was on lockdown and he didn't have access to his lockdown. But as noted in our brief, the petitioner committed a serious conduct violation that resulted in him being placed into administrative segregation. And this is essentially what he prefers to as lockdown and represented to the lower court. So I guess it's worthwhile to consider that, um, by referring to the situation as lockdown, rather than administrative segregation resulting from his serious conduct violation, he tries to shift the blame off of him. So, uh, there's ample evidence in form of a DOC, uh, conduct records and employee affidavits that his actions were his own in committing that serious offense. So clearly based on that, this was something that was within his control and it falls well outside of the extraordinary circumstances prong standard for equitable tolling established in Menominee Indian tribe. Furthermore, there's jurisprudence directly on point that's analogous to this instance situation in Dodd versus the United States. Uh, the 11th circuit held that placement in administrative segregation or solitary confinement is generally not grounds for equitable tolling. So as it pertains to this first issue, equitable tolling to grant the petitioner equitable tolling in this case would serve as a tacit endorsement of this type of behavior. Are you, um, undoing pages? I don't know. I just was looking at the 14 to 16 went down the path that I was asking about. Are you just saying you guys are withdrawing that 14 to 16 and in this in our brief? Yes, because you're making the argument I've been asking you about, um, which is that he knew about this stuff in 2000 and one, but didn't file it till 2000 and eight. And so are you withdrawing that or? Well, I think it's just, um, it's two sides of the same coin. Um, it's, it's, it's a matter of, um, diligent pursuit of the rights. So, um, you know, whether or not we want to lump that under the realm of, uh, statutory tolling of equitable tolling. All in all, it's the same thing. Okay. Because you may y'all make the argument that the magistrate judge fought, uh, ruling was not a ruling that 2012, you know, May 18, 2012 is the right date. It was an assuming argument. And so anyway, all right, I'm sorry. Go ahead. I just wanted to be clear. You stand by your brief. Let me just ask that. Uh, yes, Your Honor. Okay, go on. Uh, turning to the second issue, the district, uh, the second issue, the district court's judgment dismissing petitioner's second jurisdiction. It should be affirmed because the petitioner failed to meet at the stringent requirements for bringing successive petitions. EDPA requires dismissal of a claim presented in a second or successive habeas application, which was not presented in a prior application. Unless the facts underlying the claim, if proven and viewed in the light of the evidence as a whole would be sufficient to establish by clear and convincing evidence that, but for the violation, no reasonable fact finder would have found the applicant guilty of the underlying offense. Furthermore, EDPA places limitation on a federal court's review of state court decisions, denying Brady claims. Federal courts are not to decide de novo, whether a petitioner has sufficient. I mean, I'm well aware there's limits on us. The first rent go around second, go around even more. So I'm well aware of that. This is though. And, and the district court said the same thing, a very odd case because typically issues of alibi and whatever are not, I mean, y'all aren't really even disputing that he has very good evidence of alibi. It's really this, you know, 10 minute time period. And so does that not just concern you as a prosecutor in your core as to whether this guy has been sitting in jail for 35 years, wrongfully convicted? If, if, if that were true, if he was wrongfully convicted, that would be concerning. However, it is our position that the state present presented a strong enough case in order to convict the defendant and that the three eyewitnesses at issue the majority of the state's case rested on these, these three eyewitnesses, three disinterested eyewitnesses, each identified the petitioner as the shooter as the perpetrator in this case. And it was enough even considering all of the evidence and much of the new evidence that is essentially cumulative of what was already known to the defendant at trial and presented to the jury, even despite all of that you know, addressing the the timeline and the fact that they had a consultant that it would take to get from where the shooting occurred to the youth study center. The jury considered all of that and they found that the three eyewitnesses were credible enough to convict the defendant. So, I mean, based on that and, you know, the, the, the legal standards before us, I believe that, you know, I, I think that we'll also considering the fact that he's been denied. Did Mr. Smith live near the crime scene? I believe that he did. Do you recall, I'm assuming you do, that Mr. Smith was able to argue to the jury this question of the timeline, that it was, it was implausible that he would be able to do the crime, run away, go home, get with his mother and then, you know, go to the gas station and the youth center. What was that? I mean, was that given to the jury? I mean, to, to my knowledge, you know, the defense did make a timeline based argument, you know, for us to look back and try to assume that he wouldn't have had time to clean off blood or, you know, change his clothes that that's imparting a into his defense that we, I don't think that we are legal, legally enabled to do based on the standard of review here. I think your point is that that's certainly not newly discovered. How hard this timeline would be to me was always true. I will see. I think that that is another part of the issue, Your Honor. Um, you know, we are talking about a matter of minutes here. However, you know, even with his own witnesses, you know, I believe that at some points they weren't quite consistent either. You know, one witness would have said one time where another one might have said another one that was, you know, a few minutes off in either direction. It's the same sort of thing here. And when, when we're talking about the state's witnesses, Mr. Wheel and the Thompson sisters, you know, they were all relatively within the same general timeframe, you know, give her, give my point is more the very end of your opposing counsel's argument was kind of to the bottom line. He couldn't have done it. You know, this is just too ridiculous to think he did it. And I'm saying that argument has always been out there. That isn't something where we just found out, oh my gosh, there was DNA of some unknown person, uh, in the, on this person's whatever. And that must've come from the killer. That's the kind of newly discovered evidence that comes up later. This was not newly discovered this argument that however you look at the time, this is a hard thing for him to have accomplished even giving the benefit of the doubt to the jury's finding. Absolutely. Your honor. And that is one of the main things that the jury considered in convicting this defendant. Um, you know, they, they were faced with the issues of the timeline and, um, all of the different implications of the timeline and the firsthand testimony, and then the secondhand accounts. Um, but you know, considering all of that taken together, uh, the jury ultimately decided it was enough and the state presented enough evidence based in large part on the three eyewitness testimonies that, uh, the defendant was guilty of this crime. Let me ask you about one of those eyewitness tests. I think it was Desiree Thompson. It struck me that the clearest contradiction between, uh, with, with evidence that was withheld was the idea that she said she was driving, uh, but evidently there was incorrect. If I'm wrong, it was withheld evidence or suppressed evidence that said she was walking at the time driving versus walking. It struck me as a fairly significant, uh, divergence between her trial testimony. Am I wrong about that? Or I just, I see it addressed in the, in the, your opposing counsel's brief, but not your brief so much. Um, I'm not aware of a discrepancy between, um, actual driving and walking. I know that, uh, Miyoshi Thompson, um, there was, uh, alleged discrepancies about whether or not the Thompson sisters were stationary when they first observed the incident occurring. Um, but upon, upon further consideration, it was, um, I guess, deduce that they were driving and they first noticed the altercation occurring as they approached this intersection at Jennings for registry. Maybe you can help us too with the idea. Your opponent mentioned the photographic lineup. Uh, there's an allegation that these eyewitnesses were shown eight, I believe eight photographs, one of whom, one of which was of the defendant, uh, at, at the trial. And that in reality, there were 14 photographs. And so I'm left wondering, uh, were there two photographs of the defendant in the 14 and he was only in each person was only shown eight. Uh, and if so, what, why should we not be concerned about that? If, if photographs were withheld? Um, well, yes, your honor. Um, uh, ultimately, uh, it's the state's contention that the petitioner even failed to show that a 14 photograph array rather than an eight photograph array was shown to the witnesses for the identification. And then the district also noted that the record was very unclear at this point. Um, regarding, additionally, um, the, the petitioner, he failed to demonstrate that evidence of a 14 photograph array in lieu of an eight photograph array would have been constitutionally material to his defense, especially considering that, um, the witness wheel and Miyoshi each independently independently identified the same photograph of the petitioner as the perpetrator of the shooting. Um, so there was also the contention that the, there were two photographs of the defendant in the array. However, that was never, you know, proven. I do know that the district court noted that there were two photographs that looked similar. However, due to, um, poor conditions of the photos and quality, they weren't, they weren't able to decipher if it was indeed both to depict two photographs of the defendant. And even if it were, um, I think it was conceded that it was the defendant a few years apart. Okay. You've used your time. We have your argument. Thank you. Yes. Connor, you've saved time for rebuttal. You're muted. Um, thank you, your honor. I want to address the equitable tolling argument made by the state briefly. Um, in this case, there were proceedings that went on, um, for quite some time in state court. The state did raise the issue of untimeliness of various state court petitions and the trial court in that case, um, ruled that the petitions were timely. Um, and I think in this case where the state has very clearly conceded, um, that the arguendo date of May 20th, I'm losing the year, but May 20th is the correct date to be, um, to be arguing from. Um, and that is the same concession that they made all through federal court, all through district court. I believe, you know, what's incumbent on this court and the jurisdictional issue is that in spite of AEDPA, the district court does have discretion to grant equitable tolling when it would be unduly harsh not to do so. And in this situation where there's very agree that it can make, I mean, while I realize, uh, you know, two days isn't measured the same way as other day, it can make a difference because for example, if he'd not done it for a year after and then went into lockdown, that lockdown wouldn't matter. So it still matters whether you look at it as the, you know, parsing out the months, or you just look at it as the due diligence. Um, they did make the argument in their brief, uh, whether they really did it on oral argument or not in their brief, they did make the argument that there are years of lack of due diligence and not just the period of lockdown. How do you respond to that? This is a pro se petitioner who due to the states having, um, having hidden and misrepresented the existence of significant statements that would have been favorable to the defense, um, was meandering his way through state court with, um, and making those arguments in state court and the trial court in state court, to which I think this court owes deference, ruled that those petitions were timely, that the separately, although this doesn't go to equitable tolling, you know, separately with the jurisdictional question with successive petitions is whether or not the petitioner has been diligent in pursuing, um, pursuing relief. And the district court made a separate finding and went back through all of when this was disclosed and how it was raised by the petitioner to find that separately he was diligent. So I think under those circumstances and given the fact that this is a petitioner who, who, who made calls to the court and who, once he found out that there was no petition actually filed, um, made every swift effort to make sure that his petition was timely filed. And I think you, um, Judge Haynes put your, put your, put the, hit the nail on the head when you said that if this was someone who'd been sitting in jail for 35 years on a wrongful conviction, that we really should, you know, in, in terms of the equitable, um, tolling issue, I understand, but this is really someone who has been sitting in jail for 35 years without ever having a fair day in court and was convicted as a juvenile. To understand, we can't just conclude that and grant relief. We are subject to very, very severe restrictions on our ability to grant relief. So it doesn't really matter what I It's really what the federal standards are that would allow relief. So what's your best, you got one more minute, make your very best case for that. This was a case where the state state's only evidence against Jerome Smith. The only evidence were the statements of three eyewitnesses, alleged eyewitnesses, and the state suppressed evidence that would have undermined each one of them separately and collectively, as well as would have undermined the lead detective who bolstered all of their identifications. So what happened is when each one of them came into court, they made very definite identifications of Jerome Smith. They were very sure that, that the time was around four o'clock. Tesserae said he was five one. How, how could that be? I mean, she said that at, at the trial. So how could that have supported her viewpoint of him? So Tesserae Thompson is the most problematic of the three, but she also says that they were on foot. And, you know, this is a question of city blocks. So the difference between being on foot is that you're first seeing this incident from 240 feet away, as opposed to one to two feet, as the witnesses testified. Wheel's testimony that he was very certain all of their testimony as to the time of the incident would have been impeached with the undisclosed documents. None of them made any statements about the time of the incident in their contemporaneous statements. It was only after the state knew that Jerome Smith had an alibi from, and there was inconsistency as to whether or not he was at the youth study center at 415 or 430, but being, being as late as possible that he was there at 430 and 15 minutes to drive and 10 minutes at the gas station, they all pushed back their time of this incident occurring at trial. And the defense had no ability to impeach those times or even the uncertainty about those times, because the state suppressed every statement that would have given a definitive time as being closer to 415. And they suppressed every statement that was unclear about, about the description of the perpetrator and, and their opportunity to view the shooting. All right. Thank you. We received both sides arguments. We appreciate your argument and we appreciate your willingness to serve as a court appointed counsel, Ms. Connor. And with that, the case is under submission and we will take a five minute break before the next case.